number 418-0634, the City of Charleston v. The System of Administrative Hearing of the City of Charleston. For the appellant, we have Mr. Isley. Is that how you pronounce your last name? It is Isley? Okay, thank you. And Mr. Wetzel for the appellee. All right, you may proceed, Mr. Isley. May it please the court, counsel, good afternoon. My name is Britt Isley. I represent the City of Charleston, the appellants in this matter. This case quite simply involves a police officer who, due to a catastrophic injury, claims he is eligible for health insurance benefits under the Public Safety Employee Benefit Act. And I want to stress that word eligibility, that he claims to be eligible. This is not an entitlement. In other words, a police officer or firefighter or EMT who gets injured on the job is not entitled to life insurance afterwards. Even one who gets a line of duty pension, as Police Officer England did, does not entitle him to health insurance. Nor even in the tragic case of a death of a firefighter or police officer, does that mean entitlement? There are certain obvious elements that we need to go through to determine eligibility under FACEBA. Mr. Isley? Yes. If I could interrupt you just for a moment. Please. It makes me think of workers' compensation here, and I am wondering, in this case, because the fact pattern is so very familiar, was there a workers' compensation claim that was adjudicated in this case? I'll let counsel. I think there was. I didn't defend it. On appeal? And I could ask Mr. Wetzel that why don't I do that. I don't have a personal knowledge of that. Alright, thank you. I do know that there was litigation regarding his line of duty pension. And we're here kind of a second time on this case. The first time having to do with whether a non-home rule unit can create its own administrative process for the process to go through this kind of a hearing. But we're back here on really the substantive issue of whether he's eligible for PCEBA benefits. But there were no race judicata or collateral estoppel issues created by that prior case? No, there wasn't. This court did not make a decision. And in fact, I think it specifically said, leave for another day, the question of whether he's eligible for PCEBA. Because it wanted to give the City of Charleston a chance to hear that and to make a decision. I think there's a Bright Line test that we follow, although I use that name myself, Bright Line test, from Gaffney that has been followed through these appellate court cases such as Springborn and Wilsac and most recently in Beckman versus Peoria, to be eligible for health insurance under PCEBA when you're talking about the emergency, an investigation of an emergency by a firefighter or police officer or public safety officer, the injury must occur in response to what is reasonably believed to be an unforeseen circumstances involving imminent danger to a person or property requiring an urgent response. This is the phrase that Gaffney has used to define emergency and it has been used time and time again in order to determine whether there was truly an emergency. Or as the court in Wilsac puts it, PCEBA is to cover, quote, life-threatening or dangerous situations, end quote, in an officer's employment. So it's not just that the officer is out on duty or that the officer is responding to a call. It is a life-threatening or dangerous situation that the officer is in. That's what makes a person eligible for PCEBA benefits. But in this case, our contention is that there was no imminent danger in the facts. That in that 16 or 17 minute response that Officer Englund took from CECOM to go to Casey's and then he didn't find anything wrong, so he went on. He still tried to find on CECOM whether there was more information he couldn't, so he went on to the police department. In that whole investigation period of 16, 17 minutes, there was never circumstances involving imminent danger requiring an urgent response. That he had to attend to. And we have examples of those kinds of cases from Gaffney, beginning with Gaffney, where we have a firefighter dealing with a live fire and real smoke that has to get back to his fellow firefighters before they run out of oxygen. That's a response to an imminent danger to people that requires his urgent response. Same with the officers in Springbourne. One officer comes across a field of asphalt chunks and finds that it's a hazard, has to park his car in the roadway, making it an imminent danger to himself and others while he has an urgent response. Or the other officer in Springbourne, Sicalia, who finds an electric pole in the roadway and has to move it or has to deal with it. These are all examples showing an imminent danger to person or property requiring an urgent response. And on December 7, 2008, Englund just did not face this kind of imminent danger in any way requiring an urgent response. Now, I know that Englund, and this was picked up on by both the administrative law judge and the trial court judge, that Englund had a, quote, heightened concern, end quote, in his mind. That he was proceeding cautiously to cases. That he was using his training because he didn't know what to expect. But again, I don't think that reaches the bright line test of Gaffney of an imminent danger requiring an urgent response. In fact, he dropped the investigation, in my opinion, in trying to go back to the police department to see what was going on. And the investigation continued with another officer who was then put out after Englund had injured himself. It's not what's happening in the officer's mind. It's from the circumstances that surround the call that makes it an imminent danger requiring an urgent response. And we also don't want a slippery slope of police officers having lots of emergencies going through their minds, but not based on the circumstances or the factual world. Because every single case could then become a placebo eligibility case. I'd also like to point out that in the underlying cases, I believe the law was misinterpreted by both Judge Kiley and more by the trial court judge in saying that there was, in addition to the emergency, that he had a reasonable belief of an unlawful act per se. That he had a reasonable belief of the investigation of a criminal act. Again, there were no facts of unlawful acts in this case. There were no facts in that 16- to 17-minute SECOM call that he was investigating a criminal act. And although Englund testifies during the administrative hearing that in his mind there was a criminal act until he proved otherwise, or that there was an unlawful act until he could prove otherwise, that obviously isn't the standard. That's not the rule. So it was wrong for the trial court judge to modify these phrases saying that he reasonably believed that he was responding to an unlawful act, reasonably believed he was investigating a criminal act, when in fact the statute requires strictly that he's responding to an unlawful act or that he's investigating a criminal act. In terms of the hearing officer's findings, how do you interpret the written decision in terms of identifying what the hearing officer found as a basis for finding a better officer? Of Englund, yes, Your Honor. I think the key part of it, although he cited to Gaffney, he didn't use the Gaffney Brightline test of an imminent danger to people or property requiring an urgent response. Instead, the way he puts it, there's a three-page decision, and the way he puts it is that based on his heightened concern, he believed that there was an emergency. He was demonstrating caution and on heightened alert, is the way he put it. Lacking any specific information regarding the reason for the call, he acted reasonably in investigating the matter. He testified, quote, assuming the worst and hoping for the best, end quote. That's really the rule he used, and I don't think that's the rule that's given to us by Gaffney. Again, I would caution that if we use this kind of rule from the administrative judge, then any police officer or firefighter who feels heightened concern, and it's part of the job, I know, to have this heightened concern and hypersensitivity of concern, but that alone would be enough, failing everything else, just to get eligibility for health insurance benefits. But does it really boil down to that? Because, of course, in Section B, we have to take a look at whether or not this belief was reasonable, right? That's right. It's a subjective reasonable belief. It's not just a belief. It's a subjective reasonable belief. That's right. It appears that Judge Kiley was of the opinion that the officer was under the reasonable belief that he was responding to some type of emergency, in addition to potentially investigating a criminal act. Right, but he didn't take the next step to define what an emergency is. In other words, circumstances involving imminent danger to a person or property that required an urgent response. That's what an emergency is, according to Gaffney. And I don't think the hearing judge, the hearing officer, went that extra bit to define what an emergency was. Well, so I take it then the officer's testimony about, you know, receiving this call and thinking that the police chief needed someone there, and then you go and the person's not there, and the concerns that he expressed regarding the whole situation and how things played out, that was not adequate to support a reasonable belief? That's right, Your Honor. That's not imminent danger. Now, I don't mean to diminish Police Officer Inglom's belief that something was wrong, something had happened, that he got to Casey's and didn't find his police chief's car. He thought something was wrong. But I think we have to look at the totality of the circumstances to see, was there an imminent danger? So the officer overreacted? I would say yes, the officer overreacted. I mean, if we interpret his reaction to be a reaction to a true emergency, then we're going too far. We're going too far in saying that a belief like his should be considered an emergency. So is that the question? Should it be considered an emergency, or was his belief reasonable? What should our inquiry be? It should be based on that definition of emergency from Gaffney. I respectfully believe that that's the bright line test. And I can't get beyond that definition of an imminent danger to person or property requiring an urgent response. I can't seem to fit that in with the way Inglom dealt with those 16 or 17 minutes. And there are cases like with Wilsak, where they are dispatched, this is an EMT dispatched to a patient who is in distress. They know that patient. They know it's a diabetic patient, very overweight, needs help, and thought it was an emergency. And then eventually that emergency abated when they got there and found, oh, this person had just fallen off the bed and needed to be moved. So there was no longer an emergency. But the thinking, the circumstances were that there was an imminent danger to this patient requiring an urgent response. And I just can't, I don't see that in the 16 or 17 minutes that Inglom was responding. Although Inglom is still left to this day wondering what happened, I think for this extra element of eligibility, you have to show circumstances involving imminent danger to a person or property requiring an urgent response. What about another element in subsection B of the statute, or during the investigation of a criminal act? The hearing officer in his decision at the bottom of, towards the end of page 3, says, based on the evidence presented, the petitioner could not discount that he reasonably could be investigating an unlawful act perpetrated by another. Or a possible criminal act. I have a little trouble deciphering that. Petitioner could not discount that he reasonably could be investigating an unlawful act. I guess reading it in light of subsection B, the hearing officer is finding that the injury occurred also during the investigation of a criminal act. Is that how you read it? That's how I read it. But I'm troubled too, Your Honor, by the phrase, could not discount that. It's almost as if, because Officer Inglom in so many words said the same thing. Until proven otherwise, he said in so many words, until proven otherwise, I was in fresh pursuit. I was investigating a criminal act. I was, you know, I was looking for an unlawful act perpetrated by another. Until I, you know, until you guys could, someone else could prove otherwise, those are the things I was doing. But that's not the test. It's not, you know, that he couldn't discount it. He's actually got to prove, I think, that there was a criminal act. Kent, shouldn't we look at his actions and the circumstances and putting aside maybe the odd word choice, look at what it was that he was doing and the circumstances and from that determine whether or not the evidence supports that the injury occurred during the investigation of a criminal act? Yes. And that's all we have, you know, the facts. But the only facts that are, well, I won't say the only salient facts, but the facts that seem important to me were that he was dispatched to Casey's by his superior officer, that he went there with a dispatch, cautiously parked and looked inside and didn't see anything wrong. And by the time he got inside, talking to the manager of Casey's, they didn't know why he was there. Then he talked to an employee of Casey's. Again, they didn't know why he was there. He still, he searched the place and searched the bathroom and left Casey's not knowing what to think. So I don't think the facts at any time, I mean, perhaps he started in an investigation, what he believed was an investigation of something unlawful, something criminal, but it didn't end up that way after he got to Casey's. A lot of police activity involves investigation into certain circumstances and ultimately it may not be a criminal act or it may be found to be a criminal act. You don't know that until later. That's true. A lot of it you don't know until it actually goes to trial and it's for a judge or a jury to determine was there the intent to do something or another. But the police activity that led to that was investigation of a possible criminal act. So when I was reading your brief, I almost got the sense that your theory is that it has to be conclusively determined that this was, in fact, criminal activity when that's ultimately left for someone else to decide. Well, I think it's certainly left for you to decide for this specific case whether there was any criminal activity. But it's your position that there has to be a determination that there was a criminal act. You have to prove that there was a criminal act. I guess I wouldn't go so far as saying that there's proof of a criminal act, but there has to be circumstances involving the investigation of a criminal act. Of a potential criminal act? Yeah, I don't think the statute requires that there had been a, you know, obviously the person can't be convicted and sentenced right there for a crime. The police officer is making that a very initial investigation and along the way we find circumstances or no circumstances that there appears to be a crime in progress or an alleged crime. Here, I don't even think that we can call it an alleged crime. Even Kathy Pugh, the dispatcher, said that, you know, with her dispatches she will, you know, append some kind of modifier like a robbery in progress, you know, suspect, you know, on the loose. Here she didn't have any information. She just put it down as information. Well, the chief said he didn't make that call. Right, and then there's the chief who doesn't know anything about it. Well, he said he didn't make the call. That's right. There is evidence that someone purporting to be the chief made the call, right? Kathy Pugh testified under oath that she knows the chief's voice and that was him, but yes, if it wasn't him, then absolutely it was a crank call. But, and I imagine there are crank calls to 911, you know, that happens too. I just don't believe that there are... Counsel, I'm sorry, you're out of time. You will have additional time on rebuttal though. Thank you. Thank you again. Mr. Wetzel. If it pleases the court, counsel, my name is Chris Wetzel and I represent the interests of Stephen Englund in this matter. Before I start my argument, Justice Harris, you talked about some of the procedural concerns with workers' comp and those kind of things. I didn't represent Mr. Englund in his workers' comp case. I know when it was filed and he was awarded benefits. I don't know if those benefits were appealed up to this court. But, he did go through a pension board hearing and at the pension board hearing, the pension board ruled against Mr. Englund. We took that up on administrative review to the circuit court. Judge Schick overturned that, finding that their ruling was against a manifest way to the evidence. That was subsequently appealed up before this court. Your Honor sat on that appeal. Subsequently, I requested CEBA benefits through the city of Charleston, who denied that request. It was my approach at that time to file a complaint with the circuit court and forego the administrative hearing at the city of Charleston, not recognizing their ordinance. That was then brought up here after Judge O'Brien ruled in our favor on the facts on a bench trial. It was brought up here on two issues. One, whether or not I have to go through the administrative hearing. The second one, whether or not he was entitled to CEBA benefits. This court ruled that I needed to go through the Charleston hearing. So, it was remanded or it was dismissed and I had to go through the Charleston administrative proceeding. I didn't choose to appeal that to the Supreme Court decision. I just went to the Charleston hearing. Your Honor sat on that particular hearing as well. I forget who wrote the opinion, but he wasn't present that day. His wife was ill and so he listened to it via recording, I believe. I went through the city of Charleston's hearing. Judge Kiley wrote his opinion in awarding us benefits. The city of Charleston appealed that decision to Judge Glynn, who found that Judge Kiley's decision was not against the manifest way of the evidence. So, procedurally, that's over a 10-year period. That's where we stand today. But we don't have any raised judicata or collateral estoppel issues? Not on this, Judge. Judge, I think the issue before the court the last time disposed of this one basically saying that we'll address that if it becomes necessary after the hearing at the city of Charleston. So, there is no raised judicata or collateral estoppel issues here. Now, Justice White, you indicated about the reasonable belief and I'm glad you brought that up. Because I think that's the crux of the matter here. The city has a bright line test, which is the Gaffney decision. And I understand what that definition is, but they seem to negate that reasonable belief that it was an actual emergency. Or reasonable belief that it was an emergency. And an emergency is simply defined in the Gaffney decision. It isn't a test, it's a definition. The reasonable belief becomes the test. Now, how do we determine what the reasonable belief is? Well, Mr. Isley points out a subjective reasonable belief. What that means, in my opinion, is the way it's been documented through the cases, is the officer first subjectively has to believe he's facing an emergency. Once that's determined, then is that subjective belief reasonable? So, in this case, if you look at it, Officer England testified he believed he was in an emergency situation. He received a dispatch call from 911 dispatch operator. Now, that 911, I don't want to mislead anybody, that's CECOM, dispatch, 911. So, it's not the, they don't just deal with 911 calls. But, he did receive a call from the 911 dispatch center saying that the chief of police needed an officer to KC's immediately. Now, that's what he heard, that's what he's testified to, that's what he's testified consistently to through the entire time that this event occurred, that I've represented him. Kathy Pugh testified that she received a call and she said that Officer Jenkins said, I need an officer to KC's and abruptly hung up. She then relayed that information, which Judge Kiley picked up on in his decision, relayed that information to a second Charleston dispatcher who then talked to Officer England. So, the discrepancy is there's a second person relaying to England after Kathy Pugh received the information. So, both of them could be testifying correctly. But, Officer England, that's all the information he knew at that time. So, he's believing he's operating on an emergency. His actions support that belief. He strategically parks to where no one in KC's can see him. He cautiously approached KC's to see what's in there. Nothing appears to be out of the ordinary, okay? But, he thinks it's an emergency at that time. Now, to determine whether or not it's reasonable, you can turn to the Gaffney decision and say, well, what's unforeseen circumstances or events that occurred that would make him believe that some person or property was in imminent danger? Well, the unforeseen circumstances, he was never given any information about the dispatch call to begin with. Never. He wasn't told why he was there or why he needed to go there. He asked for that information from CECOM and they were on the process of getting that information back to him. He shows up at KC's. Their Chief Jenkins was nowhere to be found. He didn't see him. He testified he knew what his car looked like on duty. He didn't notice that Chief Jenkins was there. He walks up to the KC's store and looks in. Doesn't seem to be anything out of the ordinary. Looks around. Talks to the people inside. They don't know why he's there. Those are all unexpected circumstances. When you receive and an officer receives a dispatch call to go to a place immediately, you expect to find something. When you don't find something, that's as much of a red flag as anything. So, he's sitting there saying, what is going on? What's running through his mind? Whether it's a prank call that somebody's playing on him like Justice Harris indicated. It could have been a prank call. That they're getting him to go to KC's while they rob Sitco down the street. He testified that that was going through his mind. That he had heightened concern about that. And then you add into the additional unforeseen circumstances is after he tells CECOM to get back in contact with Chief Jenkins, they can't find him. They can't even get in contact with him. They can't call him and they can't find him. So, what in the world is going on? You just talk to him and you can't get back a hold of him and tell him what's happening. Is Chief Jenkins hurt? Is he in danger? What's happening here? Am I at the wrong location? And then there's the additional unforeseen circumstances that his most superior officer that day, Justin Peterson, who was the sergeant in command, he tries to call him over the radio at the Charleston Police Department. Can't get a hold of Sergeant Peterson. So, now he has no information why he's there. None of his superiors are available or can be contacted. That's completely out of the ordinary, unexpected. Where he was sent, there's no one knows why he's there. That's completely unexpected. So, he tells CECOM, I'm changing locations. I'm going back to the Charleston Police Department to try to get these answers. So, on his way back there, he parks his car and as he's hurrying around the back of the squad car, he falls, hits his dominant hand on the hitch, which fractures and he can't hold a gun anymore. And so, that's where his catastrophic injury comes from. At that point, Sergeant Peterson takes him off the call and places Officer Blevins on the call. Those are the fact patterns and I think all those unforeseen circumstances make this compensable for placebo because he was reasonably responding, or he was responding to what he reasonably believed was an emergency. Now, the fact that his superior placed another officer on the investigation, do we read anything into that? All that's saying is, all I'm telling you with that information, Justice, is that the city made some comment or the city has made some comment. They believed, and Mr. Issa's word, they believed that he discontinued the call, that he ended the call when he went back to the police station. The fact that Justin Peterson testified that he placed another officer on the call just demonstrates that the call wasn't concluded. It doesn't mean that his actions were any more reasonable or that Officer Blevins' interpretation of the events leads any credence one way or the other to the facts. The difference, the city cites Gaffney, Springborn, and the Wilczek decisions as basis as to why Justice Kiley's decision is against a manifest way to the evidence. Those fact patterns are completely, they're not the same as these and it always is like that. But the biggest difference here between those cases and these cases is the information that the emergency personnel person knew at the time he suffered this catastrophic injury. In Springborn, those were two consolidated appeals dealing with firefighters and training exercises. They were told explicitly what they were going to be facing, what they were going to be doing that day, the objectives, their goals, everything. So there was nothing hidden. They had all the information. The Gaffney part of that decision, of course, became compensable when the unforeseen circumstances, the hose being wrapped around the love seat, caused an immediate response to that imminent danger. The other decision was uncompensable because it was no unforeseen circumstances. He was injured in a training exercise. There was no unforeseen circumstances that occurred. So that decision was denied for those reasons. In the Springborn decision, those were two police officers. Both were dispatched. In Springborn, I think he was dispatched, was told that an off-duty officer was trying to pull over a paving truck that was spreading, paving materials was coming off the truck and preventing hazards in the roadway. And as the officer approached those, he on two different occasions stopped and removed the debris from the highway. And on the last time he did that, he slipped and fell, and it hurt his back. The Sekala case, that dealt with a, he was dispatched, accident, possible DUI at this location. He came there, he saw there was a downed power, downed streetlight. And they thought it was an imminent danger to traffic, and they just moved it. And in moving it for the second time, he injured himself. The last case, the Wilczek case, EMT was told that it was a heavier, let's say overweight, but a 200 plus pound individual with MS that needed help. He had been there on multiple occasions. He knew what the situation was. He got there. He was able to identify what it was, and that it wasn't an emergency situation. Those are all facts that those emergency personnel knew at the time. Officer England knew nothing. I mean, he was operating blind. He had to expect that it was an emergency. You want an officer to, when he gets a dispatch call to be sent out, to expect that this is an emergency, given the limited information he had. So what he didn't know gave credence to the fact that his belief was reasonable. Correct. It was an emergency. For instance, let's say that the dispatch call said, Chief of Police needs an officer to Casey's to pick up pizzas for the luncheon. Okay, well, that's not an emergency at that time. I mean, he knew that information. Just like the Wilczek decision states, whether an emergency exists depends on the circumstances of the moment. An emergency is going to arise and evade depending on as the circumstances change, or as more information is obtained. So the officer gains that information through his investigation. He may then determine that this isn't an emergency. So I would suggest, based on those unforeseen circumstances, that he wasn't expecting specifically everything, nobody knowing why he was there, the chief not being recontacted, he can't get a hold of Sergeant Peterson, the fact that no information about the dispatch call was there, all leads credence to the fact that his belief of an emergency was reasonable. And it increased over time because of these added unforeseen circumstances. Kathy Pugh only spoke to the person that called in, which was Chief Jenkins, or someone purporting to be Chief Jenkins. She believed, through the testimony, that it was an emergency. Now, she testified in cross-examination that some of that was speculation, based upon she didn't have any facts, but based on, in her state of mind, what she heard from Officer Offred, the person talking to Chief Jenkins, she thought it was an emergency situation. Based on her speculation and her experience, she testified how long she's been a dispatch operator. So, based on all those reasons, I believe Officer England is entitled to benefits under PSEBA in that he responded to what was reasonably believed to be an emergency. The last part, briefly talked about, was the second element of the investigation and the criminal act. I understand, I struggled with the same question, and the reading of the statute says reasonably believed to be an emergency, responding to what is reasonably believed to be an emergency, a criminal act or investigation. I can read the exact language, but my problem was always, I thought the reasonable belief included a criminal act in the investigation. But if you read it, I don't necessarily believe that to be the case. Now, I don't know why that is. I think it's poorly written in that it leaves a lot of things to question. But based on the plain meaning of the statute, I can't tell this Court that it's a reasonable belief to be, I think, Judge Glenn hit on it in his opinion. I didn't spend a lot of time in my brief on it or arguing with it, because I don't think those are very strong arguments based upon the plain meaning of the statute. So you're basically saying that at least the way it's written, if you read it literally, it doesn't look like they're referring to a reasonable belief that there was a criminal act. I would concede that. I believe that's accurate. I would hope that the legislature or someone would look at that part and make a decision on, because it raises questions. A criminal act, well, when do we determine that a criminal act existed? I had a previous case where there was a slip on grass involving a dog barking. Well, is that a criminal act or is that a nuisance or an ordinance violation? What is that? So I think reasonable belief needs to be added to those, or reasonable beliefs need to be stricken completely out. It looks like the city of Charleston is arguing a bright-line test here that it has to be an actual emergency, which is clearly not the case according to the Gaffney decision. But I can't sit here and argue, on the other hand, that reasonable belief needs to be included on the last two. I think it causes some problems, and you've identified the problems, but I can't, based on the plain meaning of the statute, indicate that you should decide otherwise. I think there may be something that is poorly written is the right word, but at least something needs to be done with that language to identify it. This doesn't make sense why reasonable belief to be an emergency is one thing, and reasonable belief to be an investigation or a criminal act shouldn't be included in on that. It's the same thing, almost. But I would say responding to an emergency, if it's a criminal act, I would think that could be an emergency as well. If the chief of police says, I'm being held up at gunpoint at Casey's General Store, obviously to me that's an emergency. And he shows up there and nobody's there, they have no proof of it, well, was there a criminal act or wasn't there? Well, he's reasonable to believe it's a criminal act, because of the definition. In the end, I think that Judge Kiley got it right with the reasonable belief. Officer England was responding to what he reasonably believed to be an emergency, I believe Justice, Judge Glynn's finding that it wasn't against the manifest way of the evidence was correct, and I'm asking you on behalf of Stephen England to make a similar finding as Judge Glynn. Thank you. Any rebuttal, Mr. Isley? Yes, briefly, thank you. Mr. Wetzel, in talking about whether Officer England's belief of an emergency was reasonable, hits on one part of the definition in Gaffney, that is, whether there were unforeseen circumstances. And I grant there were. That night there were unforeseen circumstances that he ran into, including not seeing his police chief's car when he got to Casey's, including not seeing anything strange at Casey's when he expected to see something wrong. But every single case that deals with emergencies in this placebo context here in Illinois, talks about Gaffney's full definition, which also involves whether there was an imminent danger requiring an urgent response. Now, I understand there may not have been any emergency here, and he could still win his benefits, even if he had a reasonable belief of an emergency. But I think we have to go to that second part of the definition and see if there were circumstances involving any imminent danger requiring an urgent response. So do we have to ask ourselves were there circumstances involving imminent danger, or do we have to ask ourselves was the officer reasonable in believing that there were circumstances involving imminent danger? And more specifically, what I'm saying is, if, based on what he saw or didn't see, would it have been reasonable for him to conclude that the chief is in danger, that something has happened to the chief, that someone is impersonating the chief, or something has gone awry? Well, that's a theory that hasn't been brought up. But I recognize that as a possibility. If Mr. Wetzel at the end of his argument said, for example, what happens if CECOM had said, there is a call, we need a dispatch, the police chief is being held at gunpoint, please respond to Casey's. That's obviously circumstances that show a reasonable belief of an emergency, because there's an imminent danger to another person requiring an urgent response. But for him to just believe in his own mind that something was wrong with the chief, that he was being held up somewhere, I think that requires him to speculate. It's not based on, in other words, we can almost summon anything from, the absence of something there, but there was nothing positive there at Casey's that we can draw from to say that there was an imminent danger requiring an urgent response. And I would mention again, these cases where placebo is being granted involve life-threatening or dangerous situations, or I guess the reasonable belief of a life-threatening or a dangerous situation. But I don't think that there are sufficient facts in this case, and that's why again, I'm asking for you to reverse the underlying trial court and administrative decision as against the manifest weight of the evidence. Thank you.